The 4th District's Appellate Court of the State of Illinois has reconvened. The Honorable Peter C. Kavanaugh presiding. Good afternoon, calling N. Ray I. S., a minor, People's State of Illinois appellee, versus Kayla S. 4-23-0634. Counsel for the appellant, please state your full name for the record. Lance Cagle, Lance Cagle Law Office. Thank you, and counsel for the appellate. Matthew Goldman for the people, your honor. Thank you. Mr. Cagle, you may proceed. Thank you. May it please the court, counsel? Your honor, as stated on brief, our main contention is that the court erred in its best interest finding, specifically in the finding that termination of the respondent's parental rights to her minor child was in her best interest, specifically, your honor, the record is clear and undisputed that this child and the respondent mother had a strong bond with each other. The child was three years old and two months old at the time of termination, at the time of the best interest hearing. The case had been going on for roughly two years, based on the record, at which time the minor child was placed with her maternal grandmother and the respondent's mother. The record indicates that mother had very frequent contact with the child, coming in to bring clothes, food by, dropping periodically by her mother's home, the foster parent's home, and also the weekly visits that were supervised by the DCFS. What was stated in the permanency report, the best interest report, immediately preceding the hearing and the testimony at hearing was that visitation occurred frequently, was the visitation. I think it's undisputed that an extremely strong bond existed. The question is, I believe, was there evidence presented that is so strong in favor of termination to overcome that bond? Your honors, respectfully, counsel, excuse me, I'm going to interrupt right away just to ask a question based on what you've told us so far. So the trial court here acknowledged that this was a closed case and indeed held, if you will, two best interest hearings at the end of the first hearing reserve decision and continued the matter for a second best interest hearing about 60 days out, which was the time period requested by respondent. And he did that, he said, really to observe some progress on her part. At the second best interest hearing, what came out was previously undisclosed information, which she had, respondent had not shared before, which was a conviction for possession of methamphetamine. Although I think it was resolved in a way that perhaps didn't leave her with a formal conviction, as well as the fact that she had not obtained any permanent housing in that period of time. So in light of those additional facts, and the court certainly having heard evidence with respect to the bonding and the strong bonding here, why was it against the manifest weight of the evidence for the trial court to go ahead and determine that it was in the best interest of IS to terminate Kayla's parental rights? Your Honor, because the new evidence that had occurred, I believe weighed more toward the issue of the mother's fitness or unfitness than it did the best interest of the child. Definitely, Your Honor has stated the developments very accurately. The drug disposition in Livingston County was revealed and made known to the court, and it was not made known to the court at the prior hearing. However, all of the other factors, the efforts of the mother throughout the case, the classes that had been completed, the domestic violence issues which led to the foster care placement, those issues, she had still made the same efforts. She still had the same bond with her child. She still had been attending the visitation. This was still a three-year-old child who identified the mother as mom and the prospective adoptive parent as a grandmother. Going to the issue and the best interest factor of the child's identity, I've never been a part of a juvenile case where the caseworker gets on the stand and says there is a risk of emotional harm to this child by a termination because of her young age and her strong bond to mother and her identification of the respondent mother as her mom and her clear identification of the foster parent as her grandmother. That was the testimony on page 149 of the record. I understand what happened in the intervening two months that Your Honor brings up, but I don't know that it overcomes the overriding issue of the child's identity, the child's young age, and the bond she had with mom. There's also another factor that the trial court articulated, however, in reaching his decision, and that was the need for permanence. Isn't that correct? And the trial court indicated that the case had gone on for about 31 months, so there was an additional factor. Now, we know that there are eight or so factors. We have talked about several of them, but one of them definitely is the child's need for permanence, and that we know the trial court did take into account here. That is accurate. I guess the need for permanence in my mind, and I struggle with this sometimes as I represent parents in these cases, this child was only three years old. There's a lot of youth left in this child, a lot of development. She hadn't even started school. It wasn't like she was placed with a non-related family or in another town or in some other place. She was placed with the maternal grandmother. She was at grandma's. That's where she was, and the testimony, interestingly, from the caseworker was that even if adoption was granted, she would live at grandmother's, and mother would be free to come and go as she wants and have all this parenting time with the child or all this contact with the child. So, the effect of this, Your Honors, was primarily legal. It was primarily the legal not that she's not going to see the child, not that it's basically a legal change from now grandma's the legal mother, and the legal mother's now just somebody, the biological mother. I don't know if I'm articulating it very well. Yes, I think so, but was the trial court trying to either punish Kayla by doing that, or was the trial court motivated instead by a desire to get the case off its docket? Is that, either of those, what happened here? I want to choose my words carefully. In that regard, I have tremendous respect for the trial court, and I don't want to say the trial court would ever make a termination decision to clear a docket. I think sometimes in these cases, and I think what may have happened here, is there was frustration by the state's attorney. There was that frustration spilled in the arguments to the court. I think the record probably reflects that level of frustration. There was an extremely long admonishment by the court to the respondent mother after the first termination hearing. There was frustration here. That's what I would call it, and I think it was frustration that respondent mother didn't make more progress in curing the unfitness as far as getting a stable house or getting a stable job. I guess it's easy, and I argued this at trial, it's easy to tell someone, hey, get a better job or get a better house, but that's easy sometimes from an attorney's position or a caseworker's position or a judge's position than it is for a domestic violence victim's position that does not have great financial resources. I don't want to say clear the docket, but I do think there was frustration with mom's lack of progress that may have over overwhelmed substantial best interest factors that favored mom in the permanency report and in the court testimony. Is that fair? I've heard your answer, counsel. Thank you. Counsel, if I may, I mean, the court's required to consider all of the statutory factors when determining whether it's in the best interest to terminate parental rights. It seems in this case certainly the bond with the mother was strong, but there was also some indication that there was a bond with the grandmother as well, correct? Yes. So it seems to me when we're focusing so much on the bond with the mother that you're asking that that one particular issue be dispositive. Do you have any particular authority for that? And I know you referenced the BB case, but there was no bonding study in this case, and the timelines there for how long this case was pending versus that instance are very different. So if you could address that for me. Your Honor, I didn't view the bond with grandmother in this case as being adverse to the bond with mother or in competition with the bond with mother. I think in some cases it is, again, when you're in an unrelated placement or there becomes an animosity between the foster parent and the respondent parent. But in this case, Kathleen Howell, the foster parent, maternal grandmother, didn't testify at this hearing. There was no evidence of any friction or problem. The evidence that I think came out at the hearing was that the bond, albeit a strong one, between the child and Kathleen Howell, the foster parent, was a grandmother-grandchild bond and the bond between respondent mother and the child was a mother-daughter bond. So I agree with the court's assessment. The permanency report certainly said that there was a strong bond between grandmother, but again, I think it was a different type of bond, and I don't think it was necessarily adverse to mom's best interest argument. Some of the other best interest factors I believe were either not addressed or weighed as neutral, such as the community the child was going to be residing in was not going to change. The child hadn't started school yet. Identity, I think, was stated as maybe not in the early developmental stages. Some of them, maybe because of the age of the child and maybe because of the close geographic proximity between mom and foster parent, maybe they just were neutral factors or really didn't factor at all in the court's analysis. So I think that's why I focus on the bonding so much. And if I can refer to the BB case, the BB case obviously is one of the more that overturns the court's best interest finding in spite of the parent-son fitness, at least the one I see the most. And I think there are a lot of similarities between those two cases. In the BB case, the children, there were two of them, were five years old, the oldest, two and a half, the youngest. Isla Southerly, the child in this case, fits right in the middle of those two toward the lower end, three and a half years old. And Your Honor, I'm not seeing a clock. I'm sorry. Am I close on time? You have seven minutes. Okay. I just wanted to make sure. I apologize. But in that particular situation, the child in this case was within the age range of the your Honor indicated there was a bonding study in BB, but there was not in this case. I don't know if a bonding study should be necessary when the facts are undisputed as to the bond. If when the caseworker stands up there and says the bond is exceptionally strong and nobody disputes that at all, the state concedes it, the defense presents evidence for mom to that not only the final best interest report, but several prior permanency reports. The BB case had some unique facts. The first foster placement failed. And so there really wasn't any bonding at all with the first foster family. And so in fact, I believe the second foster family, if I recall correctly, absconded along with the children and the mother joined them in Florida. So those aren't the facts that we have here. As I believe you acknowledged, and I think Justice Lannert referred to the maternal grandmother and IS really have a strong bond as well. And so that is one of the things that makes this case different than BB. And I understand that point, your Honor. And I understand that each of these cases is a case by case basis and the precedential value in a juvenile case because of the best interest factors. It's not the same as some other aspects of appellate review, but your Honor, I do believe that in spite and I understand the misconduct in the BB case that your Honor has referenced. However, though nothing comes to that degree, there was regular contact with the department supervising throughout this case, even after the goal had changed from return home to termination. So it is undisputed that weekly for two hour intervals with DCFS supervision, the respondent mother was coming by to see the child. And it is undisputed that she was coming by during other periods, again, to visit her mom and visit her child and bringing food by and doing these kind of things. So... But counsel, when we talk about permanency, and I understand she was given those visits, and then we compare that with, you know, different situations when we're only at the point after this case has been pending this long, that we're really still at supervised visits for two hours and we combine that. And I know it was touched upon and the concern of, you know, was there any... This trial court seemed to take the additional time saying there was a close call to give that opportunity at a second hearing date, if you will, to see where we are with things. And I guess when we look at that permanency issue, it really hadn't advanced as far as with the department beyond those two hours of supervised visits. And so when we look at permanency and how quickly we can get to that point, it seems we were still a ways on that particular factor. And I have to concede that point, Your Honor. Between the hearing and the initial hearing and the shorter second hearing, as Your Honor said earlier, what happened was a conviction was uncovered or a disposition in Livingston County was uncovered for methamphetamine, and there was no better housing or financial situation. I understand the court gave it a second shot to do that, but again, I believe given the age of this child, the bond between the parents and the overall recommendations of the caseworker and specifically the risk of harm to the child, the identity and separation between mom and grandmother, even though there's a close bond with grandmother, I understand that, but I don't know if it was the same bond. She called grandmother Nina as a colloquial term for grandmother, and she clearly identified Kayla Southerly, the respondent, as her mom. I believe those issues are strong, and I think they do have the same force without necessarily identical facts. I think they have a very similar force to what was present in BB in this case. In this case, the guardian ad litem first took the position that it was not in the best interests of the child IS to terminate her mother's parental rights, but changed their position at the second hearing. What do you make of that? The same thing I referenced earlier. I believe in the guardian ad litem's case, again, I believe there's a difference, and I think BB illustrates that difference between unfitness and continued unfitness and the best interest of the child. Those are two different sets of analysis, and in the BB case, mom was arrested right before the best interest hearing, as I recall the case, for cannabis possession or some kind of illegal drug use. That did not stop the appellate court from overturning based on the best interest finding, or from overturning the best interest finding. I think that it's very easy when we focus solely on whether a parent has a house, or focus solely on how much money a parent makes, or focus solely on the parent's stability, and that was the term used constantly throughout the arguments and throughout the questioning. It's easy to lose focus of the relationship. We're talking about severing here legally, and I believe that's what changed the difference. I will concede mom had done nothing to restore herself to fitness by introducing a drug relapse and not fixing the change. Counsel, unless all this evidence is against the manifest weight, we're really looking at the weight that the trial court gave each of these factors, and would you agree that we, as an appellate court, cannot change that weight? It is up to the trial court to determine what weight each of the factors it did, such as permanence, bonding, etc. I believe that you argued that some of the factors, a couple things the trial court mentioned, really were more appropriate for fitness, but not disregarding that for the moment. Aren't you asking this court to re-weigh what the trial court did? I'm asking the court to consider the undisputed evidence of the bond and what was established at that trial. I don't believe there was a great factual dispute at that trial. I'm not saying there should be de novo review if I can finish my answer, but what I am saying is the briefs of the respondent and the state are very similar to the court on review and the recitation of the facts. There's not a lot of difference here. I don't believe as a matter of law, and I don't believe under a manifest weight of the evidence standard, that the facts were enough to terminate in this case. That's the basis for my appeal. I hope I've answered your question. Any follow-up questions? Okay, there are none. Thank you, counsel. Mr. Goldman? Yes, your honors. May it please the court. I want to touch on something that the defense, excuse me, counsel for the respondent, that counsel brought up in his argument that essentially that some of these factors that the court weighed were essentially fitness factors, not factors that go to the best interest of the child, particularly things like the drug relapse in that new drug case and the lack of housing. One of the statutory factors is physical safety and welfare of the child, including, among other things, shelter and health. I think the court's weighing of these factors when considering the best interest of the child, it's pretty apparent. The court was not saying, well, you didn't get a good enough job or your housing wasn't high enough quality. It was the fact that at least in the first hearing there was no job. Luckily, by the second hearing, the continued hearing, they had seasonal employment, but the housing situation hadn't changed essentially at all. This is a situation where it wasn't just housing that was lackluster. There wasn't stable shelter for the child. The drug addiction issue goes directly to the child's potential safety. This isn't a circumstance that I think anybody would want a child around where somebody is abusing methamphetamine. Your Honors, I would also like to address counsel's argument related to essentially a rushed conclusion that counsel seems to be alluding to. I would say that this was rebutted by the fact that the court continued the best interest hearing. This isn't a situation where the court was rushing to judgment or the court seemed to be overly eager to close the case. Otherwise, why have an additional hearing? The court appeared to be giving the mother every opportunity to fix these problems, to address the homelessness situation, to address the joblessness situation. I would argue the same thing in relation to the guardian ad litem. The fact that in the initial hearing, she essentially was giving the mother more or less the benefit of the saying that the best interest factors didn't weigh in favor of termination. Then later, based upon new evidence, changing her mind, that shows that again, not all of the people in this courtroom were eager to close this case. That wasn't something that somebody was making a snap decision on. The guardian ad litem, I think in the second hearing, said something that was significant, which is that they were hoping for a positive change, but it appeared to be negative. The major problem is that it wasn't just that things were the same, it's that things were more or less getting worse. Do we know, counsel, you had mentioned as part of what you talked about a couple minutes ago, that the respondent's drug problem got worse. Was there evidence that she actually had a drug about her substance use? Other than the fact of that disposition, I don't think we have any clear indication of how problematic it was, just that she did have this methamphetamine possession. I think it is also significant that the parties asked, though I apologize, I can't remember which attorney actually asked this question, but she was asked if she told the caseworker about this, and this was a case that had been going on for some time at that point. It was after that either first offender or second chance probation had begun, and she said that she hadn't disclosed it to the caseworker. In the sense that that provides a little bit more light into how upfront she is about the drug situation, I think that that is potentially significant. Would she have known that she should have told her? I think common sense says that if you're accused of possessing methamphetamine, that that's something that perhaps your caseworker and certainly your attorney should be aware of. I wouldn't say necessarily putting myself in the shoes of this mother that maybe she thought she was making the right decision, but I think most people under those circumstances would know that this is a significant issue and something that people should be made aware of in a case like this where the best interests of your child is at stake. But moving on to these other factors that the court is to consider, I think Mr. Cagle hit on all of the factors particularly well. You know, the continued affection of the child, the child's sense of familiarity, their cultural ties, things of that nature. The court seemed to find that the dangers that severing ties with the mother would pose to the child in relation to those factors was mitigated by the fact that the child is going to be with grandma and that the mother would be able to be involved in the child's life after termination took place. So the kinds of things that Mr. Cagle pointed out that, for example, that there was a significant fear of damaging the child psychologically essentially through termination, that's a total separation in the future from mom. This is a situation where she will hopefully be able to have some kind of continued relationship with the child. And weighing all of these factors together, the decision for this court isn't just would we have made the same decision. The decision is was the trial court's decision against the manifest weight of the evidence. And I think in light of that standard, it's pretty clear that when the court decided that the state had met its burden of proving that the best interest factors weighed in favor of termination, you know, that's not something where the opposite result is readily apparent. You know, there's certainly factors that cut both ways. I don't think anybody would dispute Mr. Cagle's representations as to the bond between, you know, the mother and child. But when viewing all of these factors together and the fact that, you know, the homelessness situation had not changed and this additional drug disposition had come about, I would argue that it seems pretty clear that the, you know, this court should not conclude that that decision was against the manifest weight of the evidence. So did the trial court actually review each of the statutory factors that appear in the statute and did it have to do that and fail in that regard? Your Honor, I don't think that they went through each one individually from my recollection of the record and said, you know, factor A and then listing, you know, for example, all the facts that would pertain to it. But from my recollection of the documents that were provided to the court ahead of the hearing, there was actually that kind of line-by-line explanation of how the facts pertain to the factors. I believe it was done by the caseworker and the court said that it considered that and based upon that in addition to its thoughtful discussion and the more information, I think the law holds that courts are presumed to know the law and to apply it unless there's something that suggests otherwise. Based upon the fact that the court said it considered the report and discussed the evidence in the way that it did, I would argue that that was sufficient. Thank you. Yes, Your Honor. And if there are no other questions, I would I believe there's no other questions. Rebuttal? Thank you, Your Honors. I don't believe from my recollection of the record and my recollection of the two hearings that the court ever went through a line-by-line recitation of the specific statutory best 13 of the record. I'm sorry, A10 through A13 of my brief on appendix. I apologize. In the permanency report or best interest report that was tendered by the caseworker, but the court never made specific factual findings on those best interest factors. Again, the focus seemed to be on a lack of progress by mother and a lack of stable housing, specifically the step backwards in the meth case. And that was basically where we were at, certainly at the second hearing and even at the first hearing. The court's ruling at the first hearing that it was continuing or reserving its judgment on the evidence pending a further update consisted mostly of expressing frustration with the respondent mother that they were no closer to a return home than they were when the case started, specifically that supervised visits were still going on. I remember the court indicating that in the record and expressing frustration with that. But no, the court did not go through the specific statutory best interest factors. But we know, quite frankly, that there is no absolute requirement that the court do that explicitly, correct? Yes, I don't dispute that. I agree with counsel's assessment of the court's presumed to apply the law correctly, absent some manifest statement that indicates it's not. And I think that I don't disagree with that assessment. Your Honor, again, in closing, and I'll stand on my brief written and and the record. I understand counsel. I'm sorry. I understand Your Honor's question on asking the court to reweigh the evidence. And I know when you get into best interest cases, it sometimes seems like that. We've got multiple factors, and I want the factors that favor my client looked at. And I know the other side wants the factors that favor their position looked at. But ultimately, many of these factors were neutral or not referenced significantly in the case, simply because of the child's age. There were several factors that stood out, stability in favor of the state and the bond in favor of mom. And it's our position that the court erred in not giving mom more time to address these issues. She had shown in this case she could make progress, that she could finish classes, that she could have periods of production, that she could attend visitation and keep her bond going with this child. What she hadn't shown she could do was get the housing stability. And even with those setbacks that occurred between those two hearings, that still was the main problem, the primary problem. And I believe it was against and would argue that it was against the manifest weight of the court. Thank you. Thank you, counsel. Thank you both. The court takes this matter under advisement. We will now stand in recess.